**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

HAIER AMERICA TRADING, LLC,

                                    Plaintiff,

        v.                                                          1:17-cv-921
                                                                    (TJM/CFH)
SAMSUNG ELECTRONICS, CO., LTD.,
et al.,
                                    Defendants.


_____

**Thomas J. McAvoy, Sr. U.S.D.J.**


**DECISION & ORDER**

        Before the Court are Defendants' motions to dismiss this antitrust and commercial

action.  See dkt. #s 38, 40.  The parties have briefed the issues and the Court has

determined the decide the matter without oral argument.

**I.      BACKGROUND**

        This case involves the technology contained in televisions sold in the United States.

Plaintiff Haier America Trading, LLC ("Haier"), is the American subsidiary of a Chinese

electronics manufacturer which is the world's largest manufacturer of home appliances.

Complaint ("Complt."), dkt. # 1, at ¶ 16.  Haier sells televisions that comply with the

Advanced Television Systems Committee ("ATSC") and MPEG-2 standards for

broadcasting digitally.  Id. at ¶ 17.  Haier sells at least eleven models in the United States

that use these standards.  Id.

        MPEG LA, LLC ("MPEG LA"), a Delaware Company, operates as a business entity

administering licenses for various patents used to create "universal technical standards."

Id. at ¶¶ 3, 19.  MPEG LA offers access to patents "'essential'" for MPEG-2 and ATSC

"data transmission standards" by offering licensing pools of patents essential to meeting

the standards.  Id.  MPEG LA uses a "'Many-to-Many Licensing Model'" whereby "patent

holders license *many* patents neccessary for meeting a specified electronic standard to

*many* licensees.'" Id. at ¶ 20 (emphasis in original).  Such a model, "'maximizes creativity,

usage, profitability and affordability of products'" while maximizing profits for the owners of

intellectual property and makes that property available for manufacturers and end users.

Id.  MPEG LA thus creates "patent pools" and administers licensing agreements for them.

Id. at ¶ 21.

Manufacturers like Haier obtain licenses for the technology in question from MPEG

LA.  Id. at ¶ 22.  The licenses cover "patents MPEG LA represents are essential to the

ATSC and MPEG-2 standards."  Id.  This cases arises out of licenses to use the ATSC

"patent portfolio" and the MPEG-2 "patent portfolio" which Haier secured and MPEG LA

administers.  Id. at ¶¶ 10-11.  The licenses permit Haier–as licensee–to pay a per receiver

fee to use and practice the "'essential patents'" required to meet the standards.  Id. at ¶

23.  Both licenses contain language which define "essential patents" as "'any and all

claim(s), but only such claims, in a Patent which are necessarily infringed in connection

with the use or implementation of the ATSC standard under the laws of the country which

issued the patent.'"  Id.  The ATSC standard provides the technology required to receive

an "ATSC-compliant or compliant digital television signal" in the United States and other

countries that have required the use of that standard.  Id. at ¶ 24.  The MPEG-2 standard

is "integral" to the ATSC standard.  Id. at ¶ 25.  Manufacturers pay a royalty fee to MPEG

LA for each receiver that contains the licensed technology.  Id. at ¶ 26.  From 1998 to

2016 MPEG LA charged a $5.00 fee per receiver.  Id. at ¶ 27.  The fee from 2017 to 2020

is $1.50/receiver.  Id.  On January 1, 2021, the fee becomes $1.00/receiver.  Id.  A licensee

may also elect to pay a lower fee which also permits cancellation on 30-day notice.  Id.

The $5 fee originally charged by Defendant was five times a similar fee charged in

Europe.  Id. at ¶ 28.  The $1.50 fee now in place is 150-200% higher than the European

costs.  Id.

ATSC-compliant digital televisions also require the ability to decode MPEG-2 coded

video transmissions.  Id. at ¶ 29.  Digital televisions required an MPEG-2 decoder.  Id.

From 2010 until the end of 2015, the MPEG-2 patent portfolio fee amounted to $2 per unit.

From January 1, 2016 until December 31, 2017, MPEG-2 fees were between $0.35 and

$0.50 per unit.  Id.  As a result, licensing fees for televisions that complied with the ATSC

and MPEG-2 requirements amounted to $7 per unit from 2010-2015.  Id. at ¶ 30.  Haier

approached the individual patent holders whose designs were part of the ATSC and

MPEG-2 patent portfolios to try to negotiate individual licenses.  Id. at ¶ 31.  Those efforts

were unsuccessful; patent-holders refused to negotiate.  Id.  Patent holders like

Defendants Samsung and LG have insisted that licensing be obtained from MPEG LA.  Id.

at ¶ 76.

Plaintiff's Complaint describes in great detail the process by which manufacturers,

the Federal Communications Commission (FCC), and standard-setting organizations like

ATSC developed the standards for digital television that led to the licenses here in

question.  See Id. at ¶¶ 32-69.   The United States Department of Justice ("DOJ")

3

examined at least part of this process with an eye towards the impact that creating such standards would have on the competitive process.  Id. at ¶¶ 70-72.

Plaintiff claims that the way that the Defendants create and administer the patents that the license covers damages the competitive process.  They force Plaintiff to pay for licenses for patents that are not United States patents.  Id. at ¶ 77.  Some of the patents in the patent pools have expired and do not apply to receiver technology covered by the ATSC standards, but simply exist to extend the licensing scheme.  Id.  In addition, the licenses force Plaintiff to license patents not essential to the digital standards that are the purpose of the pools.  Id. at ¶¶ 77, 96.  Moreover, the patents are not fairly or reasonably priced when the relevant markets are considered.  Id. at ¶ 78-82.  The license fee remained the same, even as prices of digital tuners fell, "adversely affect[ing] lower price-tier manufacturers and sellers of smaller TV sets, such as Haier, who have to pass their costs onto [sic] customers or not enter the U.S. market at all."  Id. at ¶ 79.  Plaintiff also alleges that MPEG LA has manipulated the patent pool by replacing expired patents with new ones to "extend the lifespan of the ATSC patent portfolio and ensure its licensors can continue to receive royalties."  Id. at ¶ 83, 86.  Plaintiff alleges that these new patents are often unrelated to digital transmission and have not been properly analyzed for their suitability in the pool.  Id. at ¶ 84.  In addition, the ATSC standard requires that receivers decode MPEG-2 video, but the patents covering that technology have to be licensed from the MPEG-2 pool, not the ATSC pool, which Plaintiff contends makes both licenses unfair and unreasonable.  Id. at ¶¶ 89-90.

Plaintiff's Complaint raises eleven causes of action based on this conduct.  Count One alleges that Defendants Zenith, Samsung, Panasonic, Philips, LG, and Columbia

have violated Section 2 of the Sherman Anti-Trust Act by engaging in anticompetitive conduct to establish and manage the licensing agreements in question. Count Two alleges that all Defendants conspired to violate Sections 1 and 2 of the Sherman Act by manipulating the terms and agreements surrounding digital television technology. Count Three contends that all defendants engaged in concerted action to control the market for ATSC-compliant televisions in the United States in violation of Section 1 of the Sherman Act. Count Four alleges Defendants' supposed agreement to restrain trade violated New York's Donnelly Act. Count Five seeks a declaratory judgment that Defendant LG has engaged in patent misuse and Count Six makes similar claims against both LG and Panasonic. Count 7 raises those claims against Columbia University. Count 8 seeks a declaratory judgment that the ATSC license expired on December 31, 2016. Count 9 is a state law claim for breach of the duty of good faith and fair dealing. Count 10 claims that Haier is a third-party beneficiary of a contract between Defendants and the FCC and/or ATSC, and that Defendants breached that contract by failing to negotiate fair terms. Count 11 is a claim for promissory estoppel.

Defendants filed the instant motions to dismiss after being served with the Complaint.[1] The parties then briefed the issues.

## II.    LEGAL STANDARD

---

[1]After examining the parties' submissions and noting an ongoing state-court proceeding that appeared to implicate the same issues as this matter and was filed before this action, the Court directed the parties to file briefs concerning whether the Court should abstain from hearing the case in deference to the state-court. The parties informed the Court that the state court had dismissed the state-court causes of action parallel to the claims pending in this Court in deference to this Court's resolution of the matter. They both argue that abstention is inappropriate under the circumstances. The Court agrees.

Defendants have filed a motion to dismiss Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  Defendants argue that Plaintiff has not stated a claim upon which relief could be granted, even if all factual allegations in the complaint were proved true.  In addressing such motions, the Court must accept "all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor."  Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009).  This tenet does not apply to legal conclusions.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Id. (quoting Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007)).

## III.    ANALYSIS

Defendants have filed two motions to dismiss.  See dkt. #s 38, 40.  All Defendants join in the first motion.  The second motion, labeled as "supplemental," is brought solely by Defendant Panasonic Corporation.  The Court will address the issues raised by each motion in turn.  The Court will begin by addressing the first motion, and will consider Panasonic's motion only as necessary.

As a general matter, Defendants argue that Plaintiff's Complaint is an attempt to continue Haier's efforts to avoid paying royalties for its use of the technology covered by the ATSC and MPEG-2 patent pools.  According to the Defendants, Haier sold televisions that used ATSC standards without paying royalties beginning in 2007.  This conduct resulted in a lawsuit brought by a number of the Defendants in the Southern District of New York.  The patent-holders filed that lawsuit in 2009.  Plaintiff's Complaint

acknowledges this lawsuit, alleging that:

> On August 12, 2009, British Telecommunications PLC and others, including Samsung, LG, and Philips, sued Haier in the United States District Court for the Southern District of New York for patent infringement. The case settled upon various conditions, including requiring Haier to license the ATSC and MPEG-2 patent portfolios.

Cmplt. at ¶ 18. Defendants contend that Haier stopped paying royalties on the licenses in 2015. MPEG LA filed a state-court action to recover for the breach of the royalties provision in early 2017. Haier responded with a countersuit and third-party claims that repeated the claims made in the prior infringement action. Haier also brought the instant action, which Defendants contend brings "virtually identical" state-law claims but adds federal anti-trust claims.

Defendants offer several grounds for dismissal of this action.

### A.    Statute of Limitations

Defendants first argue that Plaintiff's anti-trust claims–counts one through four–are barred by the Sherman and Donnelly Acts' four-year statutes of limitations. They contend that Plaintiff's claims are based on the licensing agreements and the statute of limitations began to run when Plaintiff became subject to the terms of those agreements. Since Plaintiff signed the agreements in 2011, more than four years before bringing this action, the statute of limitations has run. Plaintiff responds by arguing that a new cause of action "accrues every time a defendant receives a benefit from the contract." Defendants, Plaintiff claims, have disregarded their obligations to make technology available for free, or on a reasonable non-discriminatory basis ("FRAND"), and have engaged in a pattern of

anticompetitive conduct.[2]  Those actions make the claims timely, Plaintiff argues.

Under the Sherman Act, "damages are [generally] recoverable . . . only if suit therefore is 'commenced within four years after the cause of action accrued[.]" <u>Zenith Radio Corp. v. Hazeltine Research</u>, 401 U.S. 321, 338 (1971) (quoting 15 U.S.C. § 15b). New York's Donnelly Act likewise features a four-year statute of limitations.  NY Gen. Bus. Law § 340(5).  In most cases, "a cause of action accrue and the statute begins to run when a defendant commits an act that injures a plaintiff's business."  <u>Zenith</u>, 401 U.S. at 338.  The anti-trust statute recognizes continuing violations, and permits plaintiff to recover damages for acts that occur in the future.  "[E]ach time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act[.]" <u>Id.</u>  The statute of limitations for the damages caused by that act begins on "the commission of the act."  <u>Id.</u>  "However, each separate cause of action that so accrues entitles a plaintiff to recover not only those damages which he has suffered at the date of accrual, but also those which he will suffer in the future from the particular invasion, including what he has suffered during and will predictably suffer after trial."  <u>Id.</u> at 339.

Included in Defendants' moving papers is a copy of the June 30, 2011 agreement

_____

[2]Plaintiff's Complaint discusses the process of adopting and gaining regulatory approval for the ATSC standard.  <u>See</u> Complt. at ¶¶ 47-56.  Plaintiff alleges that "[w]hen the FCC adopted portions of the ATSC standard, it prepared the Fourth Report and Order.  In that order, the FCC stated that proponents of the ATSC standard agreed to make any relevant patents they owned available either *free*, or on a ***reasonable, nondiscriminatory basis*** ["FRAND"].  <u>Id.</u> at ¶ 47 (emphasis in original).  According to the Plaintiff, the FCC "premised its adoption of the ATSC standard directly upon those assurances."  <u>Id.</u>  Plaintiff points to various promises by manufacturers and licensors of patents that the ATSC standard would follow FRAND principles.  <u>Id.</u> at ¶¶ 48-52.  Plaintiff further alleges that, after various negotiations, "[i]n or about July 2007, MPEG LA and the ATSC patent licensors came to agreement on the licensing terms of the ATSC pool," agreeing to a royalty rate.  <u>Id.</u> at ¶ 68.

that Plaintiff signed before stipulating to dismissal of the action in the Southern District of New York. See Licensing Agreement, dkt. # 38-2. In that agreement, Plaintiff agreed to "enter into the standard MPEG-2 Patent Portfolio License and the ATSC Patent Portfolio License . . . and abide by the terms of each of the Licenses, subject to paragraph 3 hereof." Id. at ¶ 1. Haier agreed to begin making royalty payments for sales beginning on August 1, 2011. Id. at ¶ 3. Plaintiff also agreed to pay back royalties on televisions sold before the agreement. Id. at ¶ 4. The agreement also provided that "[u]pon compliance with the terms of paragraphs 1-5 above, the Litigation shall be dismissed as to both HAT and Haier Group Corp. . . . with prejudice for claims through July 31, 2011." Id. at ¶ 7.

Plaintiff alleges that "Haier is a licensee of the ATSC portfolio" having "executed a license as a condition of settlement in the British Telecommunications suit." Complt. at ¶ 75. MPEG LA insisted that "Haier pay royalties dating back to December 24, 1996, the coverage date of the license that somehow predates MPEG LA's pooling of ATSC patents" as a condition of obtaining the license. Id. At some unspecified date, "Haier has attempted to negotiate license agreements" to use "technology on FRAND terms with Defendants Samsung and LG directly." Id. at ¶ 76. The Defendants rebuffed these efforts, demanding that Haier obtain those licenses from MPEG LA. Id. Attempts to reach out to other patent holders failed as well, and Haier's failure to obtain individual licenses was not unique. Id.

Defendants contend that the anti-trust statute of limitations began to run at the latest on the date that Plaintiff signed this agreement. Haier's antitrust claims are founded on an allegation that the terms of the ATSC license are anticompetitive because of the way the license pools patents and because of unfair royalty rates. Defendants further

contend that the statute of limitations began to run much earlier, when Defendants set the royalty rates for the ATSC license and made promises that such rates would be fair and reasonable. Such actions occurred in the 1990s and 2006, with the royalty rate set in July 2007, when Plaintiff alleges that "MPEG LA and ATSC patent licensors came to agreement on the licensing terms of the ATSC pool, and agreed to charge a royalty rate of $5 per unit for each television sold." Complt. at ¶ 68. Defendants point out that Plaintiff made similar antitrust allegations in a pleading in 2009, which demonstrates the Plaintiff's delay in bringing the instant court action.

Plaintiff appears not to deny that Haier's antitrust claims first accrued in 2011, outside the limitations period for either state or federal antitrust claims. Plaintiff argues, however, "multiple overt acts in furtherance of the conspiracy" reset the limitations period, Plaintiff. At the least, "every invoice MPEG LA sent to Haier constituted such an overt act," and a new injury occurred every time Haier sent payment. Haier points to a number of alleged overt acts: (1) MPEG LA's state-court action that sought to enforce a contract that violated the antitrust laws; (2) the continuation of an allegedly unreasonable pricing structure, even as the value of the patent pool declined; (3) adding nonessential patents to the ATSC license to prolong the $5.00 royalty–the Complaint points to many such patents; and (4) MPEG LA's changes to the patent pool without notice and comment from licensees–"[e]ach time MPEG LA published a list of patents for the ATSC license that had not been vetted by independent counsel constituted a new overt act for limitations purposes." Plaintiff contends that Defendants' failure to meet FRAND obligations distinguishes the limitations question in this case: "Haier," Plaintiff claims, "has pleaded specific injury rooted in the performance of the ATSC license because Haier has paid non-

FRAND royalties that MPEG LA had to provide under FRAND terms." Such action creates "recurring injuries that are not barred by any statute of limitations."

"Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." Zenith, 401 U.S. at 338. Plaintiff's damages flow from the licensing agreement, which Haier contends forces the company to pay improper royalty fees and unfairly increases the price for retail television sales. Setting aside the events that led to the lawsuit that forced Plaintiff to enter into the licensing agreement, the antitrust claims first accrued at the latest when the parties agreed to licensing contract in July 2011. That date is outside the statute of limitations, and unless the statute was somehow tolled or additional independent violations existed, Plaintiff's antitrust claims are untimely. Recognizing this, Plaintiff argues that a "continuing conspiracy to violate antitrust laws" existed, and that "a cause of action accrues to [Plaintiff] to recover the damages caused by that act, and that, as to those damages, the statute of limitations runs from the commission of the act." Id. at 339.

Plaintiff argues that its claim alleges a continuing violation. "When an antitrust injury is caused [by] a single injurious act, the statute of limitations runs from that act, even if the resulting injury continues over a prolonged period." Rite Aid Corp. v. Am. Express Travel Related Servs. Co., 708 F.Supp.2d 257, 267 (E.D.N.Y. 2010). The continuing violation doctrine can apply, however, and "a 'cause of action may also reaccrue, in the absence of a conspiracy to violate the antitrust laws, when the defendant commits an act which by its nature is a continuing antitrust violation.'" Id. (quoting Airweld, Inc. v. Airco, Inc., 742 F.2d 1184 (9th Cir. 1984)). A continuing violation requires "'[a]n overt act by the defendant . . . to restart the statute of limitations and the statute runs from the last overt

act.'" Id. at 268 (quoting Pace Indus., Inc. v. Three Phoenix Co., 813 F.2d 234, 237 (9th Cir. 1987)).  If the case involves an "illegal" contract signed outside the limitations period, "the continuing-violation question is whether acts within the limitations period toll the cause of action challenging the underlying contract." Id. The existence of such an overt act "depends on the facts of the case, the alleged antitrust violation, and the jurisdiction in which the suit is filed." Id.  Two elements must exist for an overt act: "'(1) it must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff.'" Id. (quoting DXS, Inc. v. Siemens Med. Sys. Inc., 100 F.3d 462, 467 (6th Cir. 1996)); see also, MPEG, LLC v. GXI Intl., LLC, 2013 N.Y. Misc. 2498 (N.Y. Cty Sup. Ct., June 10, 2013) (in case involving dispute over licensing agreement for technology to convert analog to digital television signal, no "overt act extended the statute of limitations" as the only act alleged was "collection of the fee as stated in the contract" which "does not constitute an independent, overt act").

As explained above, Plaintiff relies on four actions that allegedly constitute overt acts that restart the statute of limitations.  The Court is not persuaded a continuing violation occurred.  First, as a general matter, Plaintiff's basic complaint is that the licensing agreement charges an unfair fee for the technology covered by the agreement. Plaintiff's entire complaint centers on the unfairness of enforcing an agreement that requires a royalty fee Plaintiff contends is too high.  Plaintiff does not use all of the technology covered by the agreement in manufacturing televisions, and Plaintiff allegedly pays an inflated fee for the technology Plaintiff uses in manufacturing televisions.  No new injury occurs because Plaintiff pays such fees.  Defendants' demand for such fees represents Defendants' enforcement of the contract terms which Plaintiff agreed to on

signing the agreement.[3]  Plaintiff does not claim that Defendants seek a higher royalty fee than the agreement allows, or that Haier was unware of the fee schedule was signing.  No continuing violation occurs because Defendant has enforced the terms of an agreement Plaintiff signed.

Moreover, the actions Plaintiff points to as continuing violations do not convince the Court that new anti-trust violations occurred.  The first cited action, a 2017 state-court action MPEG LA filed that sought to enforce the 2011 contract cannot be considered any new overt act that restarted the statute of limitations.  MPEG LA acted to affirm an earlier action and recover royalties under that agreement.  The second such action, the continuation of an allegedly unreasonable pricing structure, even as the value of the patent pool declined, also fails to constitute a new and independent act.  Collecting on an agreement already signed certainly reaffirms the agreement.  Doing so does not create anything new and independent violation.  Defendants merely asserted their rights under the contract.  Similarly, the third act allegedly causing a continuing violation–adding nonessential patents to the ATSC license to prolong the $5.00 royalty–was again a reaffirmation of the agreement.  The agreement contemplated changes in the patent pool; adding new patents did not alter or breach the terms of the agreement.  Plaintiff does not allege that the patent pool as changed failed to provide access to the required technology

---

[3]        Plaintiff clearly agreed to that fee schedule.  The licensing agreement states:

Licensee represents that it understands that the royalty rates specified in the Agreement are payable under the terms of the Agreement and that nothing shall compel the Licensors and Licensing Administrators to reduce the royalties specified in this Agreement."  Licensing Agreement, dkt. # 38-2, at ¶ 4.8.

13

or that Defendants altered the price structure defined in the agreement.[4]  Finally, the

fourth action–changes to the patent pool without obtaining notice or comment from

licensees–does not add any new or accumulating injury to the Plaintiff.  Plaintiff does not

allege that any essential patents disappeared from the agreement.  Plaintiff alleges that

such new patents were designed artificially to inflate the value of the patent portfolio and

hide the declining value of the patents.  Such actions, even if proved true, would not have

changed the royalty fee set for the patents.  Plaintiff had already agreed to pay a set rate

for licensing the patents, and the agreement contemplated a declining value for the

patents over time, as royalty rates declined over time.[5]

    As Plaintiff cannot point to any allegations of a continuing violation, the Court must

conclude that the statute of limitations on the anti-trust claims has run.  The motion to

dismiss will be granted in this respect.  The Court declines to address the underlying

viability of the anti-trust claims under the circumstances.[6]

_____

[4]The patent pool contemplated a declining value of the patented technology in the pool.  The royalty fee decreases over the life of the agreement.

[5]The agreement also provided Plaintiff the option of licensing individual patents from the patent holders.  While Plaintiff alleges that the individual Licensors were unreceptive to individual licensing agreements, such actions do not represent an injury caused by the operation of the Licensing Agreement.

[6]In any case, the Court would grant the Defendants' motion with respect to the underlying antitrust claims.  Plaintiff has alleged facts which undermine the basis for Haier's anti-trust claim.  Plaintiff raises claims under Section 1 and 2 of the Sherman Act, and the same claims under the Donnelly Act.  "Section 1 of the Sherman Act prohibits '[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States[.]'"  George Haug Co., Inc. v. Rolls Royce Motor Cars, Inc., 148 F.3d 136, 139 (2d Cir. 1998) (quoting 15 U.S.C. § 1).  Section 2 "provides that '[e]very person who shall monopolize, or combine or conspire with any person or persons, to monopolize any part of the trade or commerce among the several States'" and makes such action a felony.  Id. (quoting 15 U.S.C. § 2).  "A private plaintiff

**B.    Declaratory Judgment (Counts Five Through Seven)**

Defendants next assert that the Plaintiff's claims for declaratory judgments finding

patent misuse, nonessentiality and unenforceability against LGE, LGE and Panasonic,

and Columbia in Counts Five through Seven must be dismissed.  They first contend that

patent misuse cannot be a stand-alone claim, but serves as an affirmative defense to an

infringement claim.  Even if Plaintiff could raise such a claim, Defendants argue, they have

not pled facts sufficient to state a claim.  Moreover, the relief that Plaintiff seeks could not

be granted by a declaratory judgement, since that issue would not address Plaintiff's

royalty obligations under the patent.  Plaintiff disputes these arguments.  The Court will

---

seeking to state a claim for violation of sections 1 or 2 of the Sherman Act must allege that
it has suffered 'antitrust injury.'" Id.  An antitrust injury is "injury of the type the antitrust
laws were intended to prevent and that flows from that which makes defendants' acts
unlawful.'" Joblove v. Barr Labs, Inc. (In re Tamoxifen Citrate Antitrust Litig.), 466 F.3d
187, 219 (2d Cir. 2006) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S.
477, 489 (1977)). This is so because the antitrust laws are aimed at protecting
"'*competition*, not *competitors*.'" Paycom Billing Servs. v. MaterCard Int'l, Inc., 467 F.3d
283, 289 (2d Cir. 2006) (quoting Brunswick Corp., 429 U.S. at 488, 489).

> Plaintiff's Complaint alleges that:
> The price of ATSC tuners has declined since the FCC adopted the ATSC
> standard. Both the FCC and industry participants interested in the
> development of the ATSC standard expected that the tuner prices would fall.
> Nonetheless, the MPEG LA license fee remained $5 from the creation of the
> portfolio to January 2017, when MPEG LA dropped the rate to $1.50 per unit.
> This means the royalty rate increased as retail prices plummeted. This
> adversely affects lower price-tier manufacturers and sellers of smaller TV sets,
> such as Haier, who have to pass their costs onto consumers or not enter the U.S.
> market at all. The license fee is therefore unreasonable.

Complt. at ¶ 79.  Plaintiff's allegations indicate the Haier may have had trouble competing
at its desired price point, and that the patent pool may have been a cause of this difficulty.
The allegations also reveal, however, that the cause of difficulty in competing was not anti-
competitive behavior, but the effect of the patent pool, which lowered the cost of
complying with the ATSC standard and thus the cost of HD televisions in general, for all
manufacturers.  Lowering the cost of technology that is necessary to compete in a market
hardly represents the kind of injury the anti-trust laws seek to prevent, and Plaintiff has not
stated a claim in this respect.

address each in turn.

### i.  Declaratory Judgment Standard

Defendants first contend that a declaratory judgement regarding alleged patent misuse in this case would be inappropriate.  "The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that in a 'case of actual controversy within its jurisdiction' a court of the United States may 'declare the rights and other legal relations' of an interested party 'whether or not further relief is or could be sought.'"  Beacon Constr. Co. v. Matco Electric Co., 521 F.2d 392, 397 (2d Cir. 1972) (quoting 28 U.S.C. § 2201).  Declaratory relief is available, "'if it is appropriate'" even when another remedy exists.  Id. (citing FED. R. CIV. P. 57).  Parties do not have an absolute right, however, to invoke the Court's jurisdiction to issue a declaratory judgment: "[t]he Act 'confers discretion on the courts' to grant or deny declaratory relief 'rather than an absolute right on the litigant.'"  Id. (quoting Public Service Commission v. Wycoff Co., 344 U.S. 237, 241 (1952)).  The purpose of the Act is "to afford a speedy and inexpensive method of adjudicating legal disputes without invoking the coercive remedies of the old procedure, and to settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of the rights or a disturbance of the relationships."  Id.   A court must exercise its discretion to hear a declaratory judgment if either of two "objectives can be achieved": "'(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'"  Broadview Chem. Corp. v. Loctite Corp., 417 F.2d 998, 1001 (2d Cir. 1969) (quoting Borchard, DECLARATORY JUDGMENTS 299 (2d ed. 1941)).

### ii.    Analysis

Count Five of Plaintiff's Complaint, asserted against LG, alleges that LG's Channel-Skipping Patents "require that a receiver be capable of automatically skipping inactive channels." Complt. at ¶ 163. The ATSC standard, however, requires no such channel-skipping requirement, but simply a recommendation. Id. Plaintiff alleges that "[i]ncluding nonessential patents in a patent portfolio that purports to license patents necessary to meet specific technological standards is not fair or reasonable to licensees who are required to pay for access to nonessential patents." Id. at ¶ 164. Moreover, including those patents in the ATSC patent portfolio amounts to "an impermissible attempt to obtain economic rights and benefits beyond the legitimate scope of those that inhere in LG's statutory patent rights[.]" Id. at ¶ 165. Such conduct is "patent misuse," Plaintiff contends. Id. Defendants, Plaintiff claims, were required to employ an independent expert to determine whether nonessential patents were included in the ATSC portfolio; they failed to do so. Id. at ¶¶ 166-67. "An actual and justiciable controversy exists," therefore, whether the channel-skipping patents "are nonessential and their inclusion in the ATSC patent portfolio violates federal and state antitrust laws." Id. at ¶ 168. To resolve this alleged controversy, "Plaintiff seeks a declaration from the Court that the LG Channel-Skipping Patents are not ATSC Essential Patents and that their inclusion in the ATSC patent portfolio and requirement that licensees license those patents with other patents necessary for the ATSC standard constitutes patent misuse and renders the LG Channel-Skipping Patents unenforceable." Id. at ¶ 169.

Count Six, asserted against Panasonic and LG, alleges that more than 40 Broadcast Patents included in the pools are directed at transmitting signals, not receiving

them.  Id. at ¶¶ 171-72.  Such patents do not serve the purpose of the ATSC license, but Defendants included them in the 2015 Portfolio "to disguise MPEG LA's weakening portfolio strength."  Defendants' inclusion of these patents "demonstrates that MPEG LA did not offer the license on reasonable terms."  Id. at ¶ 173.  In addition, "[b]y listing the Broadcast Patents as part of the ATSC patent pool, but excluding them from the license grant, MPEG LA has violated" the Department of Justice's requirement that "the MPEG-2 patent portfolio contain "only standard-essential patents, as determined by an independent expert[.]"  Id. at ¶ 174.  No such expert made that determination in this case."  Id. at ¶ 175. Plaintiff contends that "an actual and justiciable controversy exists" about whether including Broadcast Patents in the ATSC portfolio violated the antitrust laws and failed to meet FRAND requirements.  Id. at ¶ 176.  Therefore, "Plaintiff seeks a declaration from the Court that listing the Broadcast Patents as part of the ATSC pool, but excluding them from the license grant, constitutes patent misuse and renders the Broadcast Patents unenforceable."  Id. at ¶ 177.

Plaintiff asserts Count Seven against Columbia University.  Plaintiff alleges that the University's patents here in question concern MPEG-4, not MPEG-2 transmissions, and that "[n]o claims in the Columbia Patents relate to reception of ATSC-compliant signals. Id. at ¶¶ 179-80.  Plaintiff's televisions cannot decode MPEG-4 signals, and nothing in the ATSC standard requires the ability to decode such signals.  Id. at ¶¶181-82.  MPEG-LA, Plaintiff contends, failed to use the required independent expert to determine whether the Columbia patents should be part of the portfolio.  Id. at ¶ 183.  Including the patents in the portfolio added nonessential patents and violated FRAND requirements, Plaintiff claims. Id.  "An actual and justiciable controversy exists" over whether adding the Columbia

patents to the portfolio violated antitrust laws.  Id. at ¶ 184.  As such, Plaintiff "seeks a declaration from the Court that the Columbia Patents are not ATSC Essential patents and that their inclusion in the ATSC patent portfolio and requirement that licensees license those patents with other patents necessary for the ATSC standard constitutes patent misuse and renders the Columbia Patents unenforceable."  Id. at ¶ 185.

The three declaratory judgment claims here at issue therefore seek a declaratory judgment from the Court that the inclusion of certain patents in the patent pools constituted patent misuse.  Plaintiff seeks no damages as a result of this declaration.[7] Defendants argue that such claims are inappropriate, because patent misuse is a defense to a patent infringement claim, and not a separate cause of action.  The question here is whether the Court should issue a declaratory judgment concerning patent misuse in this case, where there are no claims of patent infringement and where the party seeking the misuse declaration is the plaintiff in the action.

"Patent misuse is an equitable doctrine that relates 'primarily to a patentee's actions that affect competition in unpatented goods or that otherwise extend the economic effect beyond the scope of the patent grant.'"  Max Impact, L.L.C. v. Sherwood Group, Inc., No. 09cv902, 2011 U.S. Dist. LEXIS 14542 at *13 (S.D.N.Y. Feb. 14, 2011) (quoting C.R. Bard, Inc. v. M3 Systems, Inc., 157 F.3d 1340, 1372 (Fed. Cir. 1998).  Patent misuse makes a patent unenforceable, "but it does not result in a damages award to the accused infringer."  Id. at *14.  As such, a "patent misuse is not an affirmative claim[.]"  Id.  A plaintiff

_____

[7]It is unclear to the Court exactly what conduct by the Defendants named on these counts would give rise to damages anyway, at least by direct liability.  Plaintiff does not allege that the Defendants on these counts decided to place the patents at issue in the portfolio.  Instead, Plaintiff alleges that MPEG-LA decided to include those patents.

cannot assert a claim for damages for patent misuse, and such a claim "is entirely duplicative of [a] patent misuse defense and any equitable remedy will lie there." Id. Continental Automotive GmbH v. iBiquity Digital Corporation, No. 14cv1799, 2015 WL 859569 (N.D. Ill. Feb. 26, 2015). In Continental Automotive, the plaintiff's predecessor signed an agreement with the defendant to license intellectual property for HD radio "in exchange for royalty payments." Id. at *1. Plaintiff initially paid royalties to defendant to include HD radio technology in car-audio components that plaintiff manufactured. Id. Plaintiff stopped paying the royalties after the parties disputed the components upon which the royalty payments should be based. Id. iBiguity, the defendant in the Continental case, eventually sued Continental in Maryland state court. Id. at *2. Continental then filed a federal action in the Northern District of Illinois. Id. Among plaintiff's claims in the federal action was a declaratory judgment count that sought a declaration on the patent rights at issue, patent exhaustion and patent misuse. Id. at *1, *7.

In relevant part, the court in Continental addressed whether plaintiff could state a claim for declaratory judgment on the patent misuse issue. Id. at *6-8. The court noted that "courts disagree on whether patent misuse can constitute a claim, not just a defense," and pointed to B. Braun Med. Inc. v. Abbott Labs, 124 F.3d 1419 (Fed. Cir. 1997), as the source of this disagreement. Id. at *6. The district court explained that in B. Braun, the Federal Circuit had explained that "patent misuse is 'an extension of the equitable doctrine of unclean hands, whereby a court of equity will not lend its support to enforcement of a patent that has been misused.'" Id. at *7 (quoting B. Braun, 124 F.3d at 1427). A finding of misuse makes the patent unenforceable, and "'monetary damages may not be awarded

20

under a declaratory judgment counterclaim based on patent misuse" because the patent cannot be enforced.  Id.  While recognizing that all district courts examining the issue have concluded that money damages are unavailable on a patent misuse claim, the Continental court rejected the position of some district courts that a party could bring an "affirmative claim of patent misuse so long as the plaintiff does not seek damages."  Id. (citing Rosenthal Collins Grp. v. Trading Technologies International, Inc., No. 05 C 4088, 2005 WL 3557947 at *6 (N.D. Ill. Dec. 26, 2005); Internet Pipeline, Inc. v. Aplifi, Inc., No. CIV.A. 10-6089, 2011 WL 4528340, at *3 (E.D. Pa. Sept. 29, 2011).  That court found that "patent misuse cannot be brought as a stand-alone cause of action."  Id.

The Continental court noted that B. Braun had addressed a case where the proponent of the declaratory judgment action had brought the claim "in response to a patent infringement action and not as a stand-alone cause of action[.]"  Id.  As such, the Federal Circuit had not addressed the issue of an independent declaratory judgment action on the issue, and had continued to define patent use as "a defense, rather than a cause of action in its own right."  Id. (citing Va. Panel Corp. v. MAC Panel Co., 133 F.3d 860, 868 (Fed. Cir. 1997); U.S. Philips Corp. v. Int'l Trade Comm'n, 424 F.3d 1179, 1184 (Fed. Cir. 2005)).

The same situation applies here. Plaintiff has brought a stand-alone cause of action seeking a declaration of patent misuse.  Defendants have not asserted any sort of patent infringement claim or defense.  Answering the question of whether patent misuse occurred would not answer any other question in this case, but the Court's decision could perhaps be used to preclusive effect in some other action.  Such a ruling would not serve either objective that justifies deploying the Declaratory Judgement Act:  "'(1) when the judgment

will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" Broadview Chem. Corp., 417 F.2d at 1001. Indeed, a decision from the Court here would likely serve only to introduce complexity and confusion in other cases where the patent misuse defense might be appropriate. The Court will therefore decline to exercise its jurisdiction to address Plaintiff's request for declaratory relief. The Defendants' motion will be granted in this respect. See also, Moss v. Moss, No. 2014 WL 4669302 at *2, *7 (N.D.N.Y. Sept. 18, 2014) (dismissing declaratory judgment claim in part because "by its very definition, the claim is merely an affirmative defense or counterclaim in response to a claim of patent infringement (and Plaintiff has not alleged that Defendants have asserted such a patent-infringement claim against Plaintiff, nor has Plaintiff even identified the specific patent or patents owned by Defendants and asserted against Plaintiff[.])").

### C. Count 8

Defendants also seek dismissal of Count 8. That count seeks a declaratory judgment from the Court that the ATSC license expired on December 31, 2016. Complt. at ¶ 188. Plaintiff alleges that an actual and justiciable controversy exists about this issue. Defendants argue that they do not dispute that the licenses at issue expired no later than thirty days after Haier gave notice of termination on August 11, 2017. Moreover, Defendants contend, whether the license expired on December 31, 2016 or thirty days after August 11, 2017 is not material to any controversy in this litigation. Finally, Defendants insist that Plaintiff here attempts to create an independent cause of action on this issue, which is improper under the Declaratory Judgment Act. Plaintiff responds that

an actual controversy exists because the parties disagree about whether all essential patents covered by the MPEG-2 license have expired. Plaintiff argues:

> Haier contends that all such patents have expired, but MPEG LA claims that two patents remain in force. The complaint further claims that Haier terminated both the MPEG-2 and ATSC licenses, in the event they had not expired by their own terms, effective September 10, 2017. Thus, an actual controversy also exists as to the expiration date of the MPEG-2 license.

Plaintiff's Brief, dkt. # 50, at 21.

The Court will grant the Defendants' motion in this respect. A court considering whether to entertain a declaratory judgment action should, among other questions, consider "whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved." Dow Jones & Co., Inc. v. Harrods, Ltd., 346 F.3d 357, 359 (2d Cir. 2003). Here, Plaintiff asserts that a controversy exists over exactly when the license expired, but makes no effort to explain how answering that question would resolve any issue at stake in this litigation. Plaintiff points to no issue of damages or liability that would be resolved by having the Court answer this factual question. The Court will not exercise its discretion to answer an immaterial question.

### D.    Implied Duty of Good Faith and Fair Dealing

Defendants next argue that Plaintiff cannot maintain a claim for breach of the duty of good faith and fair dealing because Plaintiff received all the benefits due under the contract in question. Plaintiff responds that whether Defendants failed to perform under the contract is an issue of fact, and that the alleged failure to engage in good faith and fair dealing injured Plaintiff by failing to provide the bargained-for FRAND license.

In New York, all contracts contain an implied covenant of good faith and fair dealing, meaning that neither party will "act arbitrarily or irrationality" in using discretion

23

conferred by the contract terms. Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389, 663 N.E. 2d 289, 291 (1995). Under the rule, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Moran v. Erk, 11 N.Y.3d 452, 456, 901 N.E.2d 187, 190 (2008). At the same time, "[t]he duty of good faith and fair dealing . . . is not without limits, and no obligation can be implied that 'would be inconsistent with other terms of the contractual relationship.'" Dalton v. Educational Testing Service, 87 N.Y.2d 384, 389, 663 N.E.2d 289, 291-92 (N.Y. 1995)(quoting Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 304, 461 N.Y.S.2d 232, 448 N.E. 2d 86 (N.Y. 1983)).

Count 9 alleges that many of the patents in the ATSC portfolio are patents for broadcasting ATSC-compliant signals to ATSC receivers. Complt. at ¶¶ 192-195. Plaintiff contends that "[b]y listing the Broadcast Patents as part of the ATSC patent pool, but excluding them from the license grant," MPEG LA violated the requirements established by the Department of Justice to include only patents essential to the standard in the patent portfolio." Id. at ¶ 196. Plaintiff alleges that "[t]o maintain a $5 fee level for the ATSC license, MPEG LA, Panasonic and LG simply added nearly four dozen patents to the Portfolio to disguise MPEG LA's weakening portfolio strength." Id. Adding these non-essential patents, Plaintiff claims, "demonstrates that MPEG LA did not perform the license in good faith." Id. at ¶ 197. Plaintiff also repeats the claims outlined above about Defendants' failure to use an independent expert to evaluate the patent pool. Id. at ¶ 198. Plaintiff alleges that Haier performed its obligations under the contract, but that including non-essential broadcast patents into the license "improperly interfered with Haier's right to the fruits of the license." Id. at ¶¶ 200-202. Plaintiff also alleges that Defendants

breached their duty of good faith and fair dealing by engaging in anticompetitive conduct. Id. at ¶ 204.

Plaintiff's allegations here are that Defendants included patents in the patent portfolio that had no value and thereby diminished the value of the portfolio for which Plaintiff paid. Plaintiff also alleges that Defendants included patents in the portfolio as a means of distorting the actual value of what Plaintiff purchased with the license. Plaintiff does not allege, however, that the portfolio failed to contain licenses for products essential for the manufacture and sale of HD televisions or that Defendants altered any terms of the contract. Instead, Plaintiff alleges that Defendants purposefully included unnecessary patents in the portfolio, and therefore diluted the value of what Plaintiff purchased.

Included in the duty of good faith and fair dealing is a pledge that "[w]here the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." Dalton v. Educational Testing Service, 87 N.Y.2d 384, 390, 663 N.E.2d 289, 291 (N.Y. 1995). Still, "a party's action must 'directly violate an obligation that may be presumed to have been intended by the parties.'" Gaia House Mezz LLC v. State Street Bank and Trust Co., 720 F.3d 84, 93 (2d Cir. 2013) (quoting Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 407-408 (2d Cir. 2006)). Moreover, the duty of good faith and fair dealing cannot "imply an obligation inconsistent with other terms of a contractual relationship." Id.

As part of the contract, Plaintiff agreed that Haier was "entering into this Agreement for its own convenience in acquiring patent rights necessary for compliance with the ATSC Standard from multiple Licensors in a single transaction rather than electing its option to negotiate separate license agreements with individual Licensors[.]" ATSC Contract at ¶

4.4.  Plaintiff also agreed that Haier "has the right to separately negotiate a license with any or all of the Licensors under any and all of the ATSC Patent Portfolio Patent(s) under terms and conditions to be independently negotiated by each Licensor, and that this Agreement has been entered into freely and at the option of Licensee." Id.  The ATSC contract also stated that "Licensee represents that it understands that it is not required by this Agreement to use all ATSC Patent Portfolio Patents licensed herein[.]" Id. at ¶ 4.6. Plaintiff did not have to pay a royalty unless it used one or more patents licensed in the portfolio, and "the respective royalty rates specified in this Agreement represents the value to Licensee of making, selling and/or offering for Sale a Licensed Product and not the value of using any particular ATSC Patent Portfolio Patent or package of ATSC Patent Portfolio Patents." Id.  Finally, the ATSC contract provided that "nothing shall compel the Licensors or the Licensing Administrator to reduce the royalties specified in this Agreement during the term of this Agreement." ATSC Contract at ¶ 4.8.

The text of the Agreement demonstrates that Plaintiff's complaint that Defendants included unnecessary patents in the portfolio does not constitute an allegation that Defendants engaged in conduct that had "the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Moran v. Erk, 11 N.Y.3d at 456.  The Agreement clearly contemplates that not all of the patents included in the patent pool would be useful to every product a licensee like Plaintiff manufactured.  As such, Plaintiff's complaint that the patent pool contained unnecessary patents is immaterial to the operation of the contract, which contemplates that the pool's list of patents would be overinclusive.  The language of the Agreement indicates that Licensees found value in a patent pool because the pool permitted them to avoid having to negotiate with individual

26

licensors to secure the patents necessary to produce their products and avoid patent litigation. Plaintiff specifically agreed that the value of the pool should not be calculated by the value of the individual patents within that pool. Moreover, the agreement makes clear that if Plaintiff had the right to bypass the pool and negotiate licenses with individual patent holders. That right undermines Plaintiff's claim that the inclusion of unnecessary patents somehow diluted the value of the patent pool.

The Court will therefore grant the Defendants' motion with respect to this claim as well. Plaintiff's complaint that Defendants included unnecessary patents in the portfolio does not constitute an allegation that Defendants engaged in conduct that had "the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Moran v. Erk, 11 N.Y.3d at 456. In obtaining a license that included the patents necessary to produce televisions with HDTV technology at an agreed upon rate, Plaintiff received the benefit of its bargain. Plaintiff's real complaint here appears to be that $5 a set sold was too much to pay for this bargain. Regret about a bad deal does not state a claim for breach of the duty of good faith and fair dealing, especially when Plaintiff would not have breached the agreement by negotiating licenses for the technology it desired without having to pay the $5 fee specified by the contract. In any case, the Defendants here named licensed their patents to be included in the portfolio, but were not themselves parties to the contract. Since the duty of good faith and fair dealing arises from a contract, the Defendants not party to the licensing contract are not liable for any breach of that duty. See, e.g., American-European Art Assocs. v. Trend Galleries, 227 A.2d 170, 171, 641 N.Y.S.2d 835 (1st Dept. 1996) (breach of duty of good faith and fair dealing claim "dismissed for lack of a valid and binding contract from which such a duty would arise.").

### E. Third-Party Beneficiary and Promissory Estoppel Claims

Defendants finally argue that Plaintiff's claims for breach of a third party contract and promissory estoppel–Counts 10 and 11–should be dismissed.  They argue that such claims are time-barred by New York's six-year statute of limitations on such claims.  Even if the claims are not time-barred, Defendants argue that any claims regarding promises about the nature of patents in the patent pool are barred by a merger agreement in the ATSC license and are unenforceable agreements to negotiate.  Defendants also contend that Plaintiff has not alleged the existence of a third-party contract or a promise on the part of the Defendants to ATSC.  Moreover, Defendants argue that Plaintiff has not alleged any reasonable reliance on such promises.  Plaintiff does not deny that the statute of limitations has run on the original contract claim, but argues that Defendants had a continuing obligation to license the ATSC patents on FRAND terms and that each new failure to do so reset the statute of limitations.  Plaintiff disputes Defendants' other arguments as well.

#### i. Third Party Beneficiary Claim

Count 10 alleges a breach of a third-party beneficiary contract against all the Defendants.  Plaintiff alleges that "Defendants, in express or implied statements to the FCC and/or ATSC, and/or via their agreements with MPEG LA, agreed to license any essential patents for the ATSC standard on FRAND terms."  Complt. at ¶ 209.  Plaintiff further alleges that Defendants, "for consideration, including membership and participation in the FCC, ATSC, and/or the ATSC patent pool . . . entered into an express and/or implied contract with the FCC and/or ATSC, to which others, including Haier, are third party beneficiaries."  Id. at ¶ 210.  Defendants, Plaintiff insists, breached their duties "by failing to

28

license their allegedly standard-essential patents on FRAND terms." Id. at ¶ 211. Defendants further breached their duty under the contract by "demand[ing] . . . unreasonable royalties and/or fail[ing] to license their allegedly essential patents on FRAND terms." Id. at ¶ 211.

Plaintiff also points to the creation of the ATSC patent portfolio, for which MPEG LA began collecting patents for inclusion in December 2004. Id. at ¶ 57. Zenith, which had initially attempted to enforce and license technology that became part of the ATSC standard on its own, began discussions with MPEG LA about joining the patent pool in late 2006 and early 2007. Id. at ¶¶ 60-62. Zenith became a licensor in the patent pool. Id. at ¶ 63. Samsung did as well, despite concerns about the effect of the $5/unit licensee rate on the cost of televisions to consumers and the potential for anti-trust concerns. Id. at ¶¶ 64-69.

Plaintiff here attempts to raise a third-party beneficiary claim. "The third-party beneficiary concept arises from the notion that 'it is just and practical to permit the person for whose benefit the contract is made to enforce it against one whose duty it is to pay' or perform." Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., 66 N.Y. 38, 43 (N.Y. 1985) (quoting Seaver v. Ransom, 224 N.Y. 233, 237 (N.Y. 1918)). To state a claim as a third-party beneficiary, a Plaintiff must show: "'(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for [their] benefit and (3) that the benefit to [them] is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate [them] if the benefit is lost.'" Mendel v. Henry Phipps Plaza W., Inc., 6 N.Y.3d 783, 786 (N.Y. 2006) (quoting Jackson Miller Summit & Spitzer v. Linder, 59 N.Y.2d 314, 336, 451 N.E.2d 459 (N.Y. 1983)).

Plaintiff's Complaint places the contract to which Haier is an alleged beneficiary in the context of the development of digital-television standards in the 1980s and 1990s. Plaintiff notes that developing "uniform technical standards can aid . . . the development of new technology." Complt. at ¶ 32. Innovations accrue as inventors provide improvements for widely used products. Id. Such standards, however, can sometimes constrain development as well. Id. The standards also have an effect on the earnings of patent holders. Id. at ¶ 33. Without a standard, other technologies are available to achieve similar ends, and the price a patent-holder can charge for a license is limited. Id. With a standard, especially one mandated by law, however, a patentee "can demand royalties that far exceed the intrinsic value of the technology." Id. To prevent this situation, "standard setting process participants that may own essential patents must generally commit to license those rights on Fair, Reasonable And Non-Discriminatory ("FRAND") terms to any manufacturer that uses the standard." Id. at ¶ 35.

The ATSC is an organization that "creat[es] and maint[ains] . . . standards related to digital television in the United States." Id. at ¶ 36. Beginning in 1987, the Federal Communications Commission ("FCC") began developing regulations for advanced television techonology. Id. at ¶ 38. The FCC created an Advisory Committee on Advanced Television Service" to bring together information about such systems, establishing "planning, testing, and implementation subcommittees" and set up a means to submit and evaluate different technologies. Id. "The ATSC worked closely with the advisory committee throughout this process." Id. Included in the proposals were four proposals for digital television systems. Id. at ¶ 39.

Sometime around February 1993, the Advisory Committee determined that an all-

digital system could be feasible.  Id. at ¶ 40.  None of the four systems were themselves

acceptable to the Committee, and the Committee requested improvements from each.  Id.

At the same time, the Committee also informed the proposers that it would entertain a

single proposal that incorporated elements from all four proposed systems.  Id.  Plaintiff

alleges that in May 1993, the parties proposing an all-digital system formed a "Grand

Alliance" to proposal a single system that could gain FCC approval.  Members of the Grand

Alliance included Zenith, which is now owned by Defendant LG.  Id. at ¶ 41.  Plaintiff

alleges that "[t]he other members were AT&T, David Sarnoff Research Center (which is

now part of SRI International), General Instrument Corp., MIT, Philips Electronics North

American Corp., and Thomson Consumer Electronics."  Id. at ¶ 41 n.5.  The ATSC

participated in testing of the system the Grand Alliance ultimately proposed, and in the end

the ATSC approved that system as the ATSC standard.  Id. at ¶ 42.

On December 24, 1996, the FCC adopted the Advisory Committee's

recommendation that the ATSC system become the digital standard.  Id. at ¶ 43.  Plaintiff

contends that "the FCC adopted the major elements of the ATSC standard, mandating its

use for digital television broadcasts in the United States."  Id.  Broadcasters would be

required to broadcast digital signals that fit the ATSC standard and digital television

receivers had "to be equipped with digital television tuners in compliance with the ATSC

standard for receiving, decoding, and presenting such digital television signals."  Id.

Legislation from Congress in 1996 mandated that television transmission be digital by

February 17, 2009.  Id. at ¶ 44.  This required consumers either to purchase digital

televisions or obtain a converter box to receive such signals.  Id.  ATSC rules for licensing

and disclosing patents aimed at preventing members from manipulating or benefitting

unfairly from the standard-setting process.  Id. at ¶ 45.  The ATSC "requir[ed] members to disclose potential 'standard essential' patents that read on the standards, and/or license them on FRAND terms."  Id. at ¶ 46.

Plaintiff alleges that the FCC, in adopting the ATSC standard, issued a Fourth Report and Order.  Id. at ¶ 47.  FCC stated that "the proponents of the ATSC standard agreed to make any relevant patents they owned available" on FRAND terms.  Id.  The FCC stated that "'[w]e reiterate that adoption of this standard is premised on reasonable and nondiscriminatory licensing of relevant patents, but believe that greater regulatory involvement is not necessary at this time.  We remain committed to this principle and if a future problem is brought to our attention, we will consider it and take appropriate action." Id.

Plaintiff contends that "various members of the Grand Alliance committed, to either the ATSC, FCC or both, that they would license their ATSC standard patents on FRAND terms."  Id. at ¶ 48.  Defendants, "for consideration, including membership and participation in the FCC, ATSC, and/or the ATSC patent pool . . . entered into an express and/or implied contract with the FCC and/or ATSC, to which others, including Haier, are third party beneficiaries."  Id. at ¶ 210.  Plaintiff points to a "pledge" from Zenith in 1995 "'that in connection with the current high definition television standards selection proceedings before the ATSC, Zenith'" would make available a license on FRAND terms.  Id.  A Zenith official in 2003 promised in communications with ATSC to make a license for certain inventions "'for compliance with the ATSC standard'" on a FRAND basis.  Id. at ¶ 49.  Likewise, "Philips' North American subsidiary" in 1995 agreed to make its intellectual property "available for licensing under FRAND conditions."  Id. at ¶ 51.  Plaintiff alleges that

"[v]arious other licensors made similar assurances to the ATSC." <u>Id.</u> at ¶ 52.

As noted above, a third-party beneficiary claim must allege a contract to which Plaintiff is not a party, but which was executed for Plaintiff's benefit. <u>See</u> <u>Mendel</u>, 6 N.Y.3d at 786. Plaintiff's description of the contract at issue is vague: that "Defendants, in express or implied statements to the FCC and/or ATSC, and/or via their agreements with MPEG LA, agreed to license any essential patents for the ATSC standard on FRAND terms." Complt. at ¶ 209. Defendants, "for consideration, including membership and participation in the FCC, ATSC, and/or the ATSC patent pool . . . entered into an express and/or implied contract with the FCC and/or ATSC, to which others, including Haier, are third party beneficiaries." <u>Id.</u> at ¶ 210. The claim thus appears to be that Defendants had a contract with either the FTC or the ATSC, that this contract required Defendants to provide essential patents on FRAND terms, and that Defendants breached this obligation. Plaintiff was injured by having to pay non-FRAND prices for the essential technology for HD televisions.

Such allegations fail to state a third-party beneficiary claim. Making all inferences in the Plaintiff's favor, the allegations laid out above do not provide sufficient detail to make plausible that the Defendants and the FTC or the ATSC even entered into a contract, much less that this contract existed which was "(2) . . . intended for [Plaintiff's] benefit and (3) that the benefit to [Plaintiff] [was] sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate [them] if the benefit is lost.'" <u>Mendel</u>, 6 N.Y.3d at 786. "To establish the existence of an enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound." <u>Kowalchuk v. Stroup</u>, 61 A.D.3d 118, 121, 873 N.Y.S.2d 43, 46 (1st

Dept. 2009).  Here, Plaintiff's allegations, read generously, perhaps indicate that

Defendants promised to provide licenses under FRAND terms for HD television pursuant to

an order from the FCC, and that this order gave Defendants an opportunity to set up the

patent pool that is the foundation of this litigation.   This promise helped to facilitate

creation of the ATSC HDTV standard that the patent pool helped spread.  Plaintiff does not

establish mutual assent or an intent to be bound.  An order from an agency is not a

contract, after all.  Plaintiff also fails to allege any sort of agreement with the standard-

setting body that Defendants provide the patents essential to the ATSC standard under

FRAND terms.  That would hardly make sense, as the standard establishes the

technological requirements for the standard but does not license the patents needed to

meet that standard.  Moreover, how a promise to a government agency or a standard-

setting organization to provide patents for a patent pool could lead to an expectation of

payments to the Plaintiff for breach of the FRAND requirement is unclear.   Since Plaintiff

bases its claim on the existence of a contract between Defendants and FCC and/or ATSC,

Plaintiff has not alleged the existence of a contract, and cannot make out a third-party

beneficiary claim.

Moreover, it is clear to the Court from the allegations in the Complaint, read as a

whole, that the injury to Plaintiff–if any–caused by the Defendants' conduct comes from a

contract that the Plaintiff was a party to–the patent-pooling agreement.  Plaintiff's

Complaint is that the cost of the license is too high, and that Defendants have included

unnecessary patents in the license as a means of inflating the value of the license

artificially and justifying this excessive cost.  That claim is not about any alleged agreement

between the Defendants and the FCC and ATSC, but about the way that Defendant

MPEG-LA has handled the patent pool.  That is a contract claim between the parties and not a third-party beneficiary claim.  On that basis, the Court will grant the Defendants' motion with respect to the third-party beneficiary claim.

Defendants also argue that the statute of limitations has run on this claim.  In New York, the statute of limitations on a contract claim is six years.  See N.Y. Civ. Prac. L. § 213(2).  State law holds that "the statute of limitation for breach of contract begins to run from the day the contract was breached, not from the day the breach was discovered, or should have been discovered."  ABB Indus. Sys. v. Prime Tech, 120 F.3d 351, 360 (2d Cir. 1997).  This rule applies even when damages only appear later.  Ely-Cruickshank Co. v. Bank of Montreal, 81 N.Y.2d 399, 402, 615 N.E.2d 98 (N.Y. 1993).  Plaintiff responds that the continuing violations doctrine permits them to bring their claims, despite that the statute of limitations has run on both claims if the claims accrued at the time the parties signed the initial agreement.  While contract claims generally have a six-year statute of limitations, "'where a contract provides for continuing performance over a period of time, each breach may begin the running of the statute anew such that accrual occurs continuously.'"  Stalis v. Sugar Creek Stores, Inc., 295 A.D.2d 939, 941, 744 N.Y.S.2d 586, 587 (4th Dept. 2002) (quoting Airco Alloys Div. v. Niagra Mohawk Power Corp., 76 A.D.2d 68, 80 (4th Dept. 1980)).  Plaintiff's claim here is that Defendants, in failing to provide the license on FRAND terms, violated their continuing obligation to provide such a license.

The Court would also grant the motion in this respect.  As explained above, all of the conduct that Plaintiff alleges occurred in the context of Defendants' promises to the FCC and ATSC occurred well more than six years ago.   The promises which provide the basis of Plaintiff's FRAND-related claim all occurred before 2011, and some as early as 1995.

Plaintiff's allegations of continuing violations of these promises did not come in the context of any contract with the FCC or the ATSC, but in the context of Defendants' FRAND obligations under the patent pool administered by MPEG LA. If a continuing violation occurred, the continuing violation occurred in a breach of that contract, not in some vague promise to provide licenses on FRAND terms to some unnamed parties.[8] Because the Court finds that the statute of limitations applies, this portion of the motion will be granted with prejudice.

## ii.    Promissory Estoppel

Count 11 alleges promissory estoppel against all Defendants. Plaintiff contends that "Defendants made representations and engaged in other conduct, including representations and/or omissions to the FCC and/or ATSC that obligated them to license any patents they may own that they allege are required to operate in accordance with the ATSC standard, on FRAND terms." Id. at ¶ 214. Those representations, Plaintiff alleges, "constituted promises to the FCC, ATSC, and/or third parties that make, use, sell, offer to sell, or import into the United States products compliant with the ATSC standard." Id. at ¶ 215. Defendants knew that their promises would be relied upon. Id. Plaintiff and other

_____

[8]As explained below, Defendants argue that these alleged contracts cannot serve as a basis for a claim because they are mere agreements to negotiate and not actual contracts. The Court's conclusions above largely adopt this argument, though for the more direct reason that Plaintiff has failed to plead an element of a third-party beneficiary claim, the existence of a contract executed with the intent to benefit a third party. The Court rejects, however, Defendants' argument that a merger agreement in the licensing agreement disclaims any prior obligations and precludes the instant third-party benefit claim. If Plaintiff had pled the existence of a contract creating a third-party benefit, Plaintiff would have pled a contract to which Plaintiff was not a party. The Court fails to see how a merger clause in a separate agreement that includes Plaintiff can cover an agreement to which Plaintiff was not a party.

third parties relied on these promises, expecting Defendants to offer licenses on FRAND terms.  Id. at ¶ 216.   Plaintiff alleges that "Haier will suffer irreparable injury by reason of the acts and conduct of Defendants alleged above until and unless the court enjoins such acts, practices and conduct."  Id. at ¶ 219.

Claims for promissory estoppel in New York require allegations of "'(1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance by the party to whom the promise is made, and (3) an injury sustained in reliance on the promise[.]'"  Fleet Bank v. Pine Knoll Corp., 290 A.D.2d 792, 797 (3d Dept. 2002) (quoting Rogers v. Town of Islip, 230 A.D.2d 727, 727 (2d Dept. 1996)).  Claims for promissory estoppel have a six-year statute of limitations.  See Superior Tech. Resources, Inc. v. Lawson Software, Inc., 17 Misc. 3d 1137(A), at ***36 (Erie Cty. Sup. Ct. Dec. 7, 2007) (citing N.Y. CPLR § 213(1)).

Here again, Plaintiff's claim is premised on Defendants' supposed failure to provide licenses on FRAND terms.  Plaintiff fails to state a claim upon which relief could be granted, and for reasons similar to those in the third-party beneficiary claims.  Plaintiff claims that Defendants promised to license patents on FRAND terms.  The idea of FRAND, however, is a flexible concept, dependent–as Plaintiff's Complaint shows–on particular markets, technological advancements, and the market segment in which a manufacturer seeks to participate.  Whether a license agreement came on FRAND terms or not depends on the contents of that offer.  Plaintiff's attempt to create a firm promise must fail, as the alleged promise offered only generalized terms, and ones which required further negotiation.  If any promise existed, the promise was simply a promise to negotiate the terms of any patent licensing agreement fairly–a promise to negotiate further is hardly an enforceable agreement.  That promise to negotiate was realized in the form of the licensing

agreement here in question.

In Lotes Co., Ltd. v. Hon Hai Precision Indus. Co., Ltd., 154 A.D.3d 579, 63 N.Y.S. 3d 328 (1st Dept. 2017), the court addressed a similar promissory estoppel claim. Plaintiffs alleged that defendants had failed "to fulfill unequivocal promises to license" certain USB technology "on RAND terms."[9] Id. The court concluded that Defendant "never made an enforceable promise to license plaintiff" the patents in question. Id. Defendant had expressed a willingness to license them, but that "commitment obliged defendant to, at most, negotiate such a license to any" plaintiff "who sought it, and it cannot serve as the basis for plaintiff's promissory estoppel claim as alleged here." Id. That reasoning applies here; Defendants' promises to ATSC and the FCC to provide licenses on FRAND terms were at best promises to negotiate the terms of such patent licenses with Plaintiff, and that does not create an enforceable promise on which a promissory estoppel claim could lie. See also, ProSource Technologies, LLC v. Housing Trust Corp., 49 Misc.3d 1205(A), at * 6, 26 N.Y.S.3d 726 (Albany Ct. Sup. Ct., Oct. 2, 2015) (dismissing a promissory estoppel claim founded on a supposed promise to subcontract with the plaintiff because such a promise "would amount to no more than an unenforceable agreement to agree, and any reliance on such a promise would be unjustified as a matter of law[.]").[10]

The Court will grant this portion of the motion with prejudice.[11] Plaintiff has alleged

_____

[9]RAND is a concept similar to FRAND. RAND stands for "reasonable and nondiscriminatory." Lotes, 154 A.D.3d at 579.

[10]Plaintiff also does not allege that Defendants made the promises in question to Plaintiff. Plaintiff alleges that Defendants made the promises to the FCC and ATSC.

[11]The Court would also grant the motion with respect to the statute-of-limitations issue. The promises clearly described in Count 11 are promises made to the ATSC and

facts which indicate that no re-pleading could lead to a viable promissory estoppel claim. Plaintiff's claims are about an unenforceable promise.

## B. Panasonic's Supplemental Motion

Defendant Panasonic Corporation filed a supplemental motion to dismiss. <u>See</u> dkt. # 40. Panasonic joined the other Defendants' arguments, but filed a supplemental motion to offer the additional argument that any claims against Panasonic should be dismissed because Plaintiff did not allege that Haier ever sought an individual patent license directly from Panasonic. Panasonic contends that the availability of an individual patent license forecloses any antitrust challenge against a licensor's participation in a patent pool. That failing, Panasonic alleges, also forecloses any state-law claims. Panasonic also contends that the declaratory judgment claims are inapposite because of a lack of controversy. Defendant disputes Panasonic's interpretation of the law and the pleading, contending that the allegations are sufficient to establish that Panasonic engaged in anti-competitive behavior by agreeing with the other Defendants not to offer individual licenses. Defendants also disputes Panasonic's contention that the state-law and declaratory judgment claims are inadequately pled.

Because the Court has adopted the other arguments made jointly by Panasonic and the other Defendants and determined to dismiss the Plaintiff's claims with prejudice, the Court will grant Panasonic's supplemental motion to dismiss. The Court will decline,

---

FCC. Those promises occurred well more than six years before Plaintiff filed the Complaint. Any claims based on those promises would be dismissed with prejudice. The wording of the Complaint is vague, however, as to whether Defendants made other FRAND-related promises within the statute-of-limitations period. The Court will not address that issue, however, as dismissal with prejudice is appropriate for the reasons stated above.

however, to address the issue of whether Plaintiff failed to plead Panasonic's failure to offer an individual license. If the Court were to grant the motion on this basis, the Court would grant that motion without prejudice to repleading, as Plaintiff could conceivably amend the pleading to include more direct allegations about Plaintiff's attempts to seek a license from Panasonic.

## IV. CONCLUSION

Defendants' joint motion to dismiss, dkt. # 38, and Panasonic's supplemental motion to dismiss, dkt. # 40, are hereby GRANTED with prejudice. The Clerk of Court is directed to CLOSE the case.

**IT IS SO ORDERED**

Thomas J. McAvoy
Senior, U.S. District Judge

Dated: September 7, 2018